UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

ASHLEY LEIGH, ERIK BERG, and
JAMES GRIFFITH,

       Plaintiffs,

v.                                                    Case No:  2:22-cv-606-JLB-NPM

ARTIS-NAPLES, INC.,

       Defendants.

_____

<u>ORDER</u>

     This cause comes before the Court on a Motion for Preliminary Injunction filed by Plaintiffs Ashley Leigh, Erik Berg, and James Griffith, who were, until recently, employed as musicians by the Naples Philharmonic.  Defendant Artis-Naples is a nonprofit arts organization that operates the Philharmonic and has mandated that all of its employees be vaccinated against COVID-19.  Plaintiffs are self-described "committed Christians" who refused to receive COVID-19 vaccines because they believe that the vaccines were "developed, tested, or otherwise made from or with fetal cell lines from aborted fetuses."  (Doc. 1 at ¶ 4.)  Plaintiffs notified Artis-Naples of their beliefs and sought religious exemptions to Artis-Naples's vaccine mandate.  These exemption requests were denied, however, and Plaintiffs were ultimately terminated because of their non-compliance with Artis-Naples's vaccine requirement.

     After their termination, Plaintiffs brought suit under Title VII of the Civil

Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, alleging that Artis-Naples discriminated against them on the basis of their religion. (Doc. 1.) Now, Plaintiffs seek a preliminary injunction prohibiting Artis-Naples from replacing their positions in the Philharmonic for the pendency of this litigation, or, in the alternative, immediately reinstating them in the Philharmonic.

This Court recently held an evidentiary hearing to determine whether Plaintiffs satisfied the requirements for the issuance of a preliminary injunction. (*See* Doc. 48.) All three plaintiffs testified, as did the Chief Operating Officer of Artis-Naples, Kathleen Van Bergen, and Artis-Naples's former personnel manager, James Dallas. After carefully reviewing the pleadings, the exhibits and testimony introduced in the evidentiary hearing, and declarations from the Plaintiffs, Mr. Dallas, and David Filner, the Executive Vice President of Artistic Operations for Artis-Naples, the Court finds that Plaintiffs' request for a preliminary injunction (Doc. 6) is **DENIED**.

That said, this decision is *narrow*. It merely holds that Plaintiffs failed to present sufficient evidence demonstrating that this Court must take the extraordinary step of intervening pre-judgment to order their reinstatement or prevent Artis-Naples from securing their replacements, thereby interrupting Artis-Naples's business operations. This decision does not put into doubt the earnestness of Plaintiffs' desire to rejoin the Philharmonic and remain in the Naples area, nor does it make any finding as to the ultimate issues of the case. This opinion simply holds that the issuance of a preliminary injunction based on the limited record

before the Court would be inappropriate.

## BACKGROUND

In July 2021, Artis-Naples announced that it was instituting a COVID-19 Policy[1] under which all employees would have to provide proof of COVID-19 vaccination by September 7, 2021.  (Doc. 6 at 7.)[2]  The COVID-19 Policy allowed exemptions for those who, due to medical or religious reasons, declined to receive a COVID-19 vaccination.  (*Id.* at 7–8.)  To evaluate employees' requests for exemption, Artis-Naples organized an Accommodation Review Committee comprised of three employees who were "supposed to engage in an interactive process with each applicant."  (*Id.* at 8.)  Plaintiffs submitted applications for religious exemptions using forms provided by Artis-Naples, and on August 18, 2021, the Committee met to discuss the roughly twelve exemption requests they had received.  (*Id.* at 16; Doc. 48 at 26–27.)

Plaintiffs allege that their accommodation requests were granted, and Mr. Dallas, who was a Committee member, has testified confirming this assertion. (Doc. 6 at 9; Doc. 6-1 at ¶ 16.)  Artis-Naples, however, has introduced evidence alleging that this August 18, 2021 Committee meeting was purely "organizational" and was "a simulated testing process" where "no actual decisions were made."  (Doc.

---

[1] Artis-Naples contends that the COVID-19 Policy was developed under the guidance of the Naples Philharmonic COVID-19 Committee, a "COVID[-19] protocols committee composed of elected Naples Philharmonic musicians or representatives and members of Artis-Naples management and board."  (Doc. 20 at 8.)

[2] Page number citations to the docket refer to the CM/ECF pagination, not the page numbers listed at the bottom of any given document.

20-1 at ¶ 27.)  As Ms. Van Bergen testified, the committee was "outlining the process for reviewing accommodation requests and how we would handle and prepare for any exemptions received by the deadline." (Doc. 48 at 106–07.)  But Mr. Dallas testified that he believed the Committee's August 18, 2021 meeting was not just "a simulation or a trial run" and that they were "actually . . . considering and deciding the exemption requests." (Doc. 48 at 27.)

On the evening of August 18, 2021, Ms. Van Bergen emailed the COVID-19 Protocols Committee stating that "[d]ue to the variety of [exemption] requests, we feel it is wise to expand the committee to welcome additional input." (Doc. 46-2 at 1.)  Mr. Filner and a clarinet player were subsequently added to the Committee. (Doc. 6-1 at ¶17.)

This new, larger iteration of the Committee reviewed all of the medical and religious exemption applications, and this time, only one application—Mr. Dallas's—was granted.  (*Id.* at ¶ 20.)  Accordingly, Plaintiffs believe that the Committee was expanded in order to ensure that their exemption requests would be denied.  (*Id.*; Doc. 6 at 9.)  Artis-Naples refutes this allegation stating that the Accommodation Review Committee denied Plaintiffs' requests because the Delta variant of the coronavirus was proliferating and "permitting unvaccinated musicians to perform on stage posed an increased risk to the health and safety of other employees." (Doc. 20 at 9–10.)

In October 2021, Artis-Naples placed Plaintiffs on leave with partial pay for the 2021-2022 concert season.  (*Id.* at 10.)  Artis-Naples then offered Plaintiffs three

options: (1) receive the COVID-19 vaccine; (2) take another year leave of absence—this time unpaid—and return to work in the 2023-2024 season if they received a COVID-19 vaccine, or (3) resign from Artis-Naples effective June 30, 2022 and receive severance pay for one year thereafter so long as they signed a full release of liability.  (*Id.*)  If Plaintiffs did not elect any of these options, then Artis-Naples would terminate their employment as of June 30, 2022.  (*Id.* at 10–11.)

Plaintiffs did not choose any of the three options presented by Artis-Naples and instead submitted additional exemption requests in April 2022 using the forms prescribed by <u>Florida Statute § 381.00317</u>.  (*See* Doc. 1-15 at 2–3; Doc. 1-16 at 2–3; Doc. 1-17 at 2–3.)  This statute, which was enacted in November 2021, forbids employers from imposing COVID-19 vaccination mandates on its employees without providing individual exemptions based on, among other things, sincerely held religious beliefs.  <u>Fla. Stat. § 381.00317</u>.  Plaintiffs also emailed Ms. Van Bergen in April 2022 to express their belief that Artis-Naples was violating Fla. Stat. § 381.00317 by denying Plaintiffs religious exemptions from their Vaccine Policy. (*See* Doc. 1-20 at 2; Doc. 1-21 at 4.)

Because Plaintiffs did not pursue the options offered to them by Artis-Naples, Artis-Naples terminated Plaintiffs' employment on June 30, 2022.  (Doc. 6 at 11.) The Philharmonic then began to advertise auditions for Plaintiff Berg's position in the Philharmonic.  (*Id.*)  Fearing that their positions at the Philharmonic would be replaced, Plaintiffs filed discrimination charges with the Equal Opportunity Employment Office, received their right to sue letters, and commenced this federal

action.  (*Id.*)  They now seek a preliminary injunction preventing Artis-Naples from replacing their positions in the Philharmonic for the pendency of this litigation, or, in the alternative, immediately reinstating Plaintiffs in their previously held positions in the Philharmonic.  (*Id.* at 5.)

## LEGAL STANDARD

To receive a preliminary injunction, a plaintiff must clearly establish the following requirements: "(1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable injury; (3) that the threatened injury to the plaintiff outweighs the potential harm to the defendant; and (4) that the injunction will not disserve the public interest." *Palmer v. Braun*, 287 F.3d 1325, 1329 (11th Cir. 2002) (citing *Suntrust Bank v. Houghton Mifflin Co.*, 268 F.3d 1257, 1265 (11th Cir. 2001)).  "A preliminary injunction is an extraordinary and drastic remedy not to be granted unless the movant clearly establishes the burden of persuasion as to the four requisites." *ACLU of Fla., Inc. v. Miami-Dade Cnty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009) (citation omitted).  If the plaintiff is unable to demonstrate a substantial likelihood of success on the merits, the court need not address the remaining preliminary injunction requirements. *Bloedorn v. Grube*, 631 F.3d 1218, 1229 (11th Cir. 2011).

The requirements for the issuance of a preliminary injunction are somewhat different in Title VII cases. *See Baker v. Buckeye Cellulose, Corp.*, 856 F.2d 167, 169 (11th Cir. 1988).  Specifically, in Title VII cases, the Eleventh Circuit has held that Federal Rule of Civil Procedure 65, which states that "[t]he court may issue a

preliminary injunction only on notice to the adverse party," encourages district courts to "conduct an evidentiary hearing before granting or denying the motion" for preliminary injunction. *Id.*; *see also McDonald's Corp. v. Robertson*, 147 F.3d 1301, 1312 (11th Cir. 1998) ("[W]here facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue, an evidentiary hearing must be held"); *see also Four Seasons Hotels and Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1211 (11th Cir. 2003) (quotations and alterations omitted) (holding that when conflicting facts "place[ ] in serious dispute issues central to a party's claims and much depends upon the accurate presentation of numerous facts, the trial court errs in not holding an evidentiary hearing to resolve these hotly contested issues").  As such, in Title VII cases, the Court should conduct such an evidentiary hearing to determine whether the defendant has rebutted the presumption of irreparable harm as well as whether the plaintiff has satisfied the three other requirements for the issuance of a preliminary injunction. *Baker*, 856 F.2d at 170.

## DISCUSSION

### I.     Likelihood of Success on the Merits

The Court first considers Plaintiffs' likelihood of success on the merits.  *See Sapphire Consulting Servs. LLC v. Anderson*, No. 6:20-cv-1724-CEM-LRH, 2021 WL 1053276, at *3 (M.D. Fla. Feb. 12, 2021).  To establish a substantial likelihood of success on the merits, a plaintiff must demonstrate a likelihood of success at trial as to both its prima facie case and the affirmative defenses asserted by the defendant.

7

*See Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 573–74, 576–78 (5th Cir.

1974); *Lucky Cousins Trucking, Inc. v. QC Energy Res. Tex., LLC*, 223 F. Supp. 3d

1221, 1225 (M.D. Fla. 2016).

Plaintiffs brings their "disparate treatment" (Count II) and "wrongful

termination" (Count III) claims (Doc. 1 at ¶¶ 173–197) under 42 U.S.C. § 2000e-

2(a)(1).  This section of Title VII makes it unlawful for an employer:

> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or
>
> (2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin.

42 U.S.C. § 2000e-2(a)(1).  As the Supreme Court has explained, "[t]hese two

proscriptions, often referred to as the "disparate treatment" (or "intentional

discrimination") provision and the "disparate impact" provision, are the <u>only</u> causes

of action under Title VII."  *EEOC v. Abercrombie & Fitch Stores, Inc.*, 575 U.S. 768,

771 (2015) (emphasis added).

Thus, to the extent that Plaintiffs seek to create a unique cause of action for

"wrongful termination" that is separate from "disparate treatment," such a move is

misguided.  First, because there are only two forms of employer practices that are

prohibited explicitly by 42 U.S.C. § 2000e-2(a)(1)—"disparate treatment" and

"disparate impact"—Plaintiffs cannot bring a separate cause of action for "wrongful

termination" under the portion of Title VII to which they cite.  Second, based on the plain language of the statute, the concept of "wrongful termination" is clearly contemplated by the disparate treatment cause of action established under 42 U.S.C. § 2000e-2(a)(1) given its prohibition on "discharg[ing] any individual . . . because of such individual's . . . religion."  Accordingly, Plaintiffs' claims brought under the heading "wrongful termination" (Count III) are more appropriately assessed as a part of Plaintiffs' disparate treatment claims.

Furthermore, Plaintiffs' effort to create a separate cause of action for "failure to accommodate" (Count I) by citing to the portion of Title VII defining the term "religion"—42 U.S.C. § 2000e(j)—is also confused given that 42 U.S.C. § 2000e(j) is part definition and part affirmative defense, but certainly not the source of an independent legal claim.  *See* 42 U.S.C. § 2000e(j) (defining the word religion in Title VII to "include[ ] all aspects of religious observance and practice, as well as belief"); *see Abercrombie & Fitch*, 575 U.S. 768 at 772 n.1 (referring to the statute as "the § 2000e(j) 'undue hardship' defense to the accommodation requirement"); (Doc. 1 at ¶¶ 160–172).  As Justice Thomas noted in his concurring opinion in *Abercrombie & Fitch*, "The Court today rightly puts to rest the notion that Title VII creates a freestanding religious-accommodation claim."  575 U.S. at 789 (Thomas, J., concurring).

Thus, based on the claims asserted by Plaintiffs, and their attendant Title VII citations, the Court will assess Plaintiffs' failure to accommodate, disparate treatment, and wrongful termination claims (Counts I–III) together.  This approach

is customary in the Eleventh Circuit. *See, e.g.*, *Walden v. Ctrs. for Disease Control & Prevention*, 669 F.3d 1277, 1293 (11th Cir. 2012) (reviewing a Title VII disparate treatment claim, wherein an employee alleged that her employer had discriminated against her by failing to accommodate her religious beliefs and by wrongfully discharging her, under a combined 42 U.S.C. § 2000e-2(a)(1) analysis) (citing *Morissette-Brown v. Mobile Infirmary Med. Cntr.*, 506 F.3d 1317, 1321 (11th Cir. 2007)). The only other remaining claim brought by Plaintiffs—retaliation under 42 U.S.C. § 2000e-3(a) (Count IV)—will be addressed separately below.

### A. Plaintiffs have not shown a substantial likelihood of success on the merits as to their disparate treatment claims.

To succeed on a disparate treatment religious discrimination claim, a plaintiff must first prove that: (1) he had a bona fide religious belief that conflicted with an employment requirement; (2) he informed his employer of his belief; and (3) he was discharged for failing to comply with the conflicting employment requirement. *Walden*, 669 F.3d at 1293. If a plaintiff proves these three elements, "the burden shifts to the employer to establish that it provided the employee with a reasonable accommodation or that an accommodation would cause an undue hardship." *Beadle v. Hillsborough Cnty. Sheriff's Dep't*, 29 F.3d 589, 591–93 (11th Cir. 1994).

Here, Plaintiffs have introduced evidence that they had bona fide religious beliefs which prevented them from complying with Artis-Naples's COVID-19

Policy.[3]  (*See* Doc. 6-2 at ¶ 2; Doc. 6-3 at ¶ 2; Doc. 6-4 at ¶ 22.)  They have also

introduced evidence that they informed Artis-Naples of these sincerely held

religious beliefs by filing requests for exemption to the Accommodation Review

Committee as well as requests for exemption pursuant to Fla. Stat. § 381.00317(2).

(*See* Doc. 1-3; Doc. 1-4 at 2–3; Doc. 1-15 at 2–3; Doc. 1-16 at 2–3; Doc. 1-17 at 2–3.)

Finally, Plaintiffs have introduced evidence that they were terminated from their

positions at Artis-Naples because they failed to comply with Artis Naples's COVID-

19 Policy.  (*See* Doc. 6-2 at ¶ 2; Doc. 6-3 at ¶ 2; Doc. 6-4 at ¶ 22.)  The Court

therefore finds that Plaintiffs have established a prima facie case for religious

discrimination under Title VII.

   At this point, the burden shifts to the defendant to show that it made a good-

faith effort to reasonably accommodate the plaintiff's religious belief, or that it is

unable to reasonably accommodate the plaintiff's religious belief without undue

---

[3] Whether opposition to a vaccine constitutes a sincerely held religious belief is a
contested issue on which the circuit courts of appeals have split.  *Compare Fallon v.
Mercy Catholic Med. Ctr. of Se. Pa.*, 877 F.3d 487, 492 (3rd Cir. 2017) (holding that
employee's objection to flu vaccine did not qualify as a religious belief protected by
Title VII because his beliefs that "one should not harm their own body and . . . that
the flu vaccine may do more harm than good" did not "address fundamental and
ultimate questions having to do with deep and imponderable matters"), *with
Sambrano v. United Airlines, Inc.*, No. 21-11159, 2022 WL 486610, at *1 n.2 (5th
Cir. Feb. 17, 2022) (explaining that courts should generally accept that plaintiffs'
professed religious views are sincere, and questioning whether the connection
between plaintiffs' opposition to vaccines and their religious convictions constitutes
a "bizarre inquisition into the sincerity of [plaintiffs'] beliefs").  Be that as it may,
whether one's religious belief is *sincerely held* is a question of fact for a jury.  *See
Telfair v. Fed. Exp. Corp.*, 934 F. Supp. 2d 1368, 1382 (S.D. Fla. March 28, 2013)
(explaining that ordinarily, the sincerity of an employee's religious belief is a
"quintessential fact question [ ]" appropriately reserved "for the fact finder at trial").

hardship.  *Walden*, 669 F.3d at 1293.  Stated differently, the Court must determine whether the employer offered a reasonable accommodation to the employee. *Ansonia Bd. of Educ. v. Philbrook*, 479 U.S. 60, 69 (1986).  If it did not, then the Court evaluates whether the employee's requested accommodation would cause the employer an undue hardship.  *Id.* at 67.  Whether the employer provided a reasonable accommodation and whether such accommodation would cause an undue hardship are separate inquiries.  *Id.*

### i.    Artis-Naples did not provide reasonable accommodations to Plaintiffs.

First the Court must determine what constitutes a "reasonable accommodation."  The plain language of the statute directs employers to "reasonably accommodate" religious practices, so "Title VII requires otherwise-neutral policies to give way to the need for an accommodation."  *Abercrombie & Fitch Stores, Inc.*, 575 U.S. at 775.  Both Supreme Court and Eleventh Circuit precedent suggest that the Court's task is to determine whether an offered accommodation eliminates the conflict between a job requirement and the religious practice.  *Ansonia*, 479 U.S. at 70; *Morissette-Brown*, 506 F.3d at 1322–23. (combining rotating scheduling system, shift change, opportunity to transfer positions, and other accommodations would "eliminate[ ] the conflict between employment requirements and religious practices," thereby reasonably accommodating a Sabbath observer).

The Court must also determine whether the offered accommodation is reasonable.  *See* 42 U.S.C. § 2000e(j).  The word "reasonable" is not defined, so the

12

Court looks to its ordinary meaning.  *Taniguchi v. Kan Pacific Saipan, Ltd.*, 566 U.S. 560, 566 (2012) ("When a term goes undefined in a statute, we give the term its ordinary meaning.").  Webster's Dictionary defines "reasonable" to mean "not conflicting with reason; not absurd; not ridiculous; being or remaining within the bounds of reason; not extreme; not excessive."  *Reasonable*, Webster's Third New Int'l Dict. 1892 (3d ed. 1993).  Here, therefore, the word "reasonable" requires that an adjustment to an otherwise neutral policy need not go beyond what is necessary to eliminate the conflict.  That is, a "reasonable accommodation" does not obligate the employer to "choose any particular reasonable accommodation," *Ansonia*, 479 U.S. at 68, or to grant an employee's preferred accommodation, *see Pinsker v. Joint Dist. No. 28J of Adams & Arapahoe Ctys.*, 735 F.2d 388 (10th Cir. 1984) ("[Title VII] does not require employers to accommodate the religious practices of an employee in exactly the way the employee would like to be accommodated.  Nor does Title VII require employers to accommodate an employee's religious practices in a way that spares the employee any cost whatsoever.").

Many different tactics can be employed to reasonably eliminate a conflict between employers' vaccine requirements and employees' religious practices.  For example, allowing a firefighter to wear a respirator, allowing doctors and nurses to participate in telemedicine instead of seeing patients in person, allowing hospital administrators to work remotely, or allowing paramedics to "apply[ ] for different jobs within the City, tak[e] paid leave, tak[e] unpaid leave, essential function layoff, or retirement/resignation."  *See Horvath v. City of Leander*, 946 F.3d 787, 790 (5th

13

Cir. 2020); *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 292 (2d Cir. 2021); *Does 1-6 v. Mills*, 16 F.4th 20, 28 (1st Cir. 2021); *Bacon v. Woodward*, No. 2:21-cv-0296-TOR, 2021 WL 5183059, at *1 (E.D. Wash. Nov. 8, 2021).

Here, as presented by Plaintiffs, the conflict at issue is between Artis-Naples's COVID-19 vaccine requirement for all musicians and Plaintiffs' refusals to get vaccinated based on their sincerely held religious beliefs that the COVID-19 vaccines were "developed using the cell lines of aborted babies." (Doc. 6 at 8.) Artis-Naples was therefore required under Title VII to eliminate this conflict by providing Plaintiffs with an accommodation unless doing so would create an undue hardship. *See* 42 U.S.C. § 2000e(j); 29 C.F.R. § 1605.2(b) (explaining that Title VII requires an employer, once on notice, to reasonably accommodate an employee whose sincerely held religious belief, practice, or observance conflicts with a work requirement, unless providing the accommodation would create an undue hardship).

Plaintiffs have introduced scant evidence to show that they communicated to Artis-Naples that they "were willing to comply with alternative safety measures such as regular testing, masking, and symptom monitoring" prior to their being placed on leave. (Doc. 6 at 9.) For example, Plaintiffs have submitted a copy of an accommodation request form prepared by Artis-Naples in which, presumably, a musician might indicate a willingness to wear a mask or be regularly tested, but the form is blank. (Doc. 1-3 at 2–3.) Indeed, the only indication that Plaintiffs intended to communicate their proposed accommodations to Artis-Naples was an email sent by Plaintiffs to other musicians in the Philharmonic expressing their willingness to

14

commit to testing, wearing masks, social distancing, and using air filters, and requesting that the other musicians fill out a survey that Plaintiffs could present to management indicating their comfort with Plaintiffs' proposed accommodations. (Doc. 1-4 at 3.)  (*Id.*)  Because Plaintiffs have not introduced evidence that these proposed accommodations were ever communicated directly to Artis-Naples in the fall of 2021, the Court is not persuaded that Plaintiffs made a reasonable effort to request any accommodation from Artis-Naples other than a blanket exemption from the vaccination requirement.  (*See* Doc. 46-1 at 2.)

Nevertheless, Artis-Naples also failed to introduce evidence demonstrating that it made any effort towards reasonably accommodating Plaintiffs' religious beliefs, despite the fact that its own COVID-19 Policy required such efforts.[4]  (*See* Doc. 46-1 at 2.)  Instead, the undisputed timeline reflects that roughly a month after Plaintiffs' exemption requests were denied, and without having had any discussions about the accommodations that might be available to Plaintiffs, Plaintiffs were placed on paid leave.[5]  (Doc. 20-1 at ¶¶ 31–37.)

---

[4] Artis-Naples's COVID-19 Policy includes a clause regarding accommodations stating that "[t]he Committee will consider the Musician's role and the requirements of that position as well as whether the accommodation will pose an undue hardship on Artis-Naples or poses a direct threat to the health and safety of others."  (Doc. 46-1 at 2.)  The Policy also states that if a requested accommodation was denied, "the Committee will communicate any available alternative accommodations.  If additional information or requirements are needed, the Committee will state so in writing and allow a reasonable amount of time for a written response."  (*Id.*)

[5] Artis-Naples notes that "special payments equal to 70% of the Plaintiffs' base pay" were offered to Plaintiffs during the 2021-2022 season and that such payments were "entirely gratuitous."  (Doc. 20-1 at ¶¶ 37–38.)  Because these payments were characterized by Artis-Naples as "entirely gratuitous" and because Artis-Naples

Artis-Naples has not introduced evidence that any of its management personnel attempted to convene with Plaintiffs to discuss alternative safety precautions that might have allowed Plaintiffs to safely do their jobs while remaining unvaccinated in the fall of 2021.  Ms. Van Bergen testified that she and others "were talking about establishing the [interactive] process, there were many discussions that occurred . . . [w]e were all in this new process together, and we were seeking counsel and talking about effecting our accommodation process," but that Artis-Naples never actually initiated such a process.  (Doc. 48 at 107.)  And Mr. Dallas testified that it was his understanding that after approving exemption requests, the Accommodations Review Committee would turn to approving accommodation requests.  (*Id.* at 25.)  But Mr. Dallas added that he believed the Committee "put off the individual accommodation decision[s] for [a] later date" because they "wanted the consensus" from Artis-Naples executives.  (*Id.* at 26.)  Mr. Dallas squarely testified that "[w]e had gone back and thought we were going to . . . reconvene with Kathleen Van Bergen and David Filner to decide what the path forward was for each of these individuals."  (*Id.* at 27.)  But since Plaintiffs' exemption requests were ultimately not approved, such discussions of individualized accommodations never took place.  (*Id.*)

Accordingly, because Artis-Naples made no attempt to even discuss the possibility of accommodating Plaintiffs, their placement of Plaintiffs on paid leave

---

cites to no caselaw suggesting that such payments could be construed as accommodations, the Court will not engage in analyzing those payments as accommodations.

did not constitute an accommodation as contemplated by Title VII because the conflict between Artis-Naples's policies and Plaintiffs' religious beliefs was not eliminated.  Even though Plaintiffs appear to have done nothing themselves to initiate the interactive process, the language of Title VII is clear that once learning of an employee's need for a religious accommodation, an employer has an obligation to reasonably accommodate the individual's religious practices.  *See* 29 C.F.R. § 1605.2(c)(1).

Because Artis-Naples failed to introduce evidence that it attempted to provide an accommodation for Plaintiffs' religious beliefs, or even engage in the interactive process of determining what such an accommodation might look like, the Court turns to whether providing Plaintiffs with an accommodation permitting them to avoid Artis-Naples's vaccine requirement would result in an undue hardship for Artis-Naples.

### ii.   Artis-Naples has met its minimal burden of establishing that providing a reasonable accommodation would cause an undue hardship on its business.

An employer is not required "to accommodate at all costs."  *Ansonia*, 479 U.S. at 70.  The undue hardship defense refers to "any act requiring an employer to bear more than a 'de minimis cost' in accommodating an employee's religious beliefs." *Beadle v. City of Tampa*, 42 F.3d 633, 636 (11th Cir. 1995).  A de minimis cost includes "not only monetary concerns, but also the employer's burden in conducting its business."  *Id.*  The undue hardship analysis is case-specific, requiring a court to look to "the context of the particular employer's operations."  *U.S. Airways v.*

17

*Barnett*, 535 U.S. 391, 402 (2002).  Ultimately, the undue hardship test is "not a difficult threshold to pass."  *See Webb v. City of Phila.*, 562 F.3d 256, 260 (3rd Cir. 2009).

Examples of undue hardships include negative impacts on the employer's operations, such as productivity or quality, personnel and overtime costs, increased workload on other employees, reduced employee morale, and the creation of conflicts with other employee's contractual rights or rights under a collective bargaining agreement.  *See Peterson v. Hewlett-Packard Co.*, 358 F.3d 599, 607 (9th Cir. 2004) ("[A]n employer need not accommodate an employee's religious beliefs if doing so would result in discrimination against his co-workers or deprive them of contractual or other statutory rights."); *Virts v. Consol. Freightways Corp. of Del.*, 285 F.3d 508, 517–18 (6th Cir. 2002) (holding that trucking firm had no obligation under Title VII to accommodate a driver's religious request for only male driving partners, where making assignments in this manner would have violated collective bargaining agreement); *Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1153 (10th Cir. 2000) (holding that because seniority system in the collective bargaining agreement gave more senior employees first choice for job assignments, it would be an undue hardship for employer to grant employee's accommodation request not to be scheduled to work on Saturdays); *Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141, 147 (5th Cir. 1982) (holding there was undue hardship where accommodations "resulted in disruption of work routines and a lowering of morale" among coworkers and employer was "also harmed because its employees are

compelled to accept less favorable working conditions"); *Wilson v. U.S. W. Commc'ns*, 58 F.3d 1337, 1341–42 (8th Cir. 1995) (explaining that requiring a religious employee's coworkers to accept her practice of wearing a button with a photograph of a fetus was "antithetical to the concept of reasonable accommodation" because the employee's beliefs were imposed on her coworkers and disrupted the workplace); *EEOC v. GEO Grp., Inc.*, 616 F.3d 265, 273 (3rd Cir. 2010) ("A religious accommodation that creates a genuine safety or security risk can undoubtedly constitute an undue hardship for an employer.").

Finally, the Court finds it instructive that the EEOC recognizes that impacts on coworkers may constitute an undue hardship under Title VII.  EEOC, Compliance Manual on Religious Discrimination § 12-IV(B)(4) (2021), https://www.eeoc.gov/laws/guidance/section-12-religious-discrimination#h_25500674536391610749867844 (explaining that "general disgruntlement, resentment, or jealousy of coworkers will not" constitute undue hardship, which "generally requires evidence that [an] accommodation would actually infringe on the rights of coworkers or cause disruption to the work").  As the EEOC has advised, "a showing of undue hardship based on coworker interests generally requires evidence that the accommodation would actually infringe on the rights of coworkers or cause disruption of work."  *Id.* In sum, Artis-Naples was only required to offer reasonable accommodations if such accommodations would not impose an undue hardship on its business, and infringement on other employees' job rights or benefits and impairment of

19

workplace safety can certainly present an undue hardship.  *See id.* at § 12-IV(B)(2) (2021); *see also Beadle*, 42 F.3d at 636.

Artis-Naples contends that allowing Plaintiffs to remain in the Philharmonic while unvaccinated would impose more than a de minimis cost to accommodate.  As a threshold matter, Artis-Naples has introduced evidence that its vaccination policy was not a unilateral decision made by Artis-Naples executives but rather, was the result of collective bargaining among the players' association.  (*See* Doc. 20-1 at ¶ 21.)  As Ms. Van Bergen testified, "[t]he COVID-19 protocols committee came out of our collective bargaining agreement in the year 2020 and . . . is still in effect today." (Doc. 48 at 98.)  Mr. Filner added that the COVID-19 protocols committee included five Naples Philharmonic musicians who were elected by their peers to represent their interests in the process of "open[ing] up the Collective Bargaining Agreement and . . . discuss[ing] changes" including adopting a COVID-19 Policy.  (Doc. 20-1 at ¶¶ 21–22.)  As Mr. Dallas testified, "the COVID protocols committee . . . was formed by representatives of the various departments of Artis-Naples, and the purpose of this committee was to find a path forward."  (Doc. 48 at 36.)  Thus, Artis-Naples has introduced clear evidence that it was the Artis-Naples employees themselves who wanted the vaccine requirement insofar as their representatives on the protocols committee implemented this requirement on their behalf by creating and adopting the COVID-19 Policy.  (Doc. 20-1 at ¶¶ 21–24.)

In demonstrating that the COVID Policy was collectively bargained for by the musicians, Artis-Naples has shown that accommodating Plaintiffs' desires to not be

vaccinated would implicate the entire Philharmonic who chose to be bound by the COVID-19 vaccine requirement.  The potential impact that a vaccination exemption might have on the entire cohort of musicians who, through its representatives, adopted a uniformly applied COVID Policy weighs in favor of the significance of the burden that such an exemption might place on the conduct of Artis-Naples's business.  *See* 42 U.S.C. § 2000e(j); *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 81 (1977) (explaining that Title VII does not contemplate unequal treatment between employees, and "[i]t would be anomalous to conclude that by 'reasonable accommodation' Congress meant that an employer must deny the . . . preference of some employees, as well as deprive them of their contractual rights, in order to accommodate or prefer the religious needs of others").

In addition to demonstrating the impact on other employees that an exemption to the vaccination requirement may cause, Artis-Naples also introduced evidence "that permitting unvaccinated musicians to perform on stage" created an undue hardship for Artis-Naples because it "posed an increased risk to the health and safety of other employees."  (Doc. 20-1 at ¶ 36.)  Specifically, Artis-Naples asserts that it adopted the COVID Policy "in response to the FDA's guidance at that time that vaccination was the most effective way to prevent the transmission, contraction, and/or severe side effects of COVID-19."  (*Id.* at ¶ 23.)  Artis-Naples has introduced evidence that its Accommodations Review Committee was concerned with, and motivated by, what it perceived as the innumerable health risks presented by allowing Plaintiffs to practice and perform in the Philharmonic while

unvaccinated.  First, the Accommodation Review Committee noted that "[e]ach Plaintiff's position required frequent indoor contact, in close proximity with other musicians for extended periods of time (many hours continuously)—all while performing physically demanding work."  (*Id.* at ¶ 34.)  And second, at the time the Accommodations Review Committee was evaluating Plaintiffs' accommodation requests, "the predominant variant was the highly transmissible Delta variant.  The Delta variant had severe side effects and took hundreds of thousands of lives."  (*Id.* at ¶ 35.)

These concerns were echoed by Ms. Van Bergen who testified that the Accommodation Review Committee considered a number of factors, including the long duration of close contact between on-stage performers during rehearsals and performances as well as the physically demanding nature of stage performance.  (Doc. 48 at 112–13.)  As Ms. Van Bergen testified, "[w]e evaluated all of the risks, and as we were making decisions for the entire organization, we felt that the risks of musicians being unvaccinated on stage had not changed."  (*Id.* at 88.)  And emails from Ms. Van Bergen to Plaintiffs consistently reflect the same concerns.  In fact, the initial email announcing the COVID-19 Policy to Artis-Naples employees states that the vaccination requirement was instituted to support Artis-Naples's commitment to a "full and robust reopening for the 2021-22 season" and that the organization's priority was "the collective health and safety of our employees as well as our patrons, guest artists and volunteers."  (Doc. 46-1 at 1.)  And a later email from Ms. Van Bergen to Mr. Dallas notes the same, stating that "[t]he Committee,

comprising representative[s] of the Artis-Naples Board, staff, and orchestra musicians, unanimously determined that the increased health and safety risks posed by unvaccinated on-stage performers warranted that requirement and the denial of exemption requests." (Doc. 46-4 at 1.)

Even Plaintiffs recognized the unique risk factors posed by playing their instruments for extended periods in an orchestra setting. For example, Ms. Leigh, who plays the clarinet, told her coworkers that because she played a wind instrument—which presumably (1) involves some expectorating and intense, concentrated breathing, and (2) makes mask wearing impractical if not impossible—she would commit to testing every day in order to avoid placing her fellow Philharmonic members at risk. (*See* Doc. 1-4 at 3.)

Further, all parties have noted that the accommodations referenced by Plaintiffs—masking, testing, social distancing, using air purifiers—were not procedures unfamiliar to Artis-Naples. Specifically, during the 2020-2021 season, Artis-Naples established mandatory masking and testing procedures; it also upgraded air filtration systems, employed touchless systems in restrooms, placed hand sanitizer dispensers backstage, encouraged social distancing backstage, and modified the on-stage orchestra set up so that musicians were seated farther apart. (Doc. 48 at 21–22.) This case is therefore unlike those cases where an employer makes no effort to act on an accommodation request, and the court subsequently finds that the employer failed to introduce sufficient evidence to meet its burden of proof establishing that the plaintiff's proposed accommodation would actually have

posed an undue hardship.  *See, e.g.*, *EEOC v. Arlington Transit Mix, Inc.*, 957 F.2d 219, 222 (6th Cir. 1991) ("After failing to pursue . . . [a] reasonable accommodation, the company is in no position to argue that it was unable to accommodate reasonably [plaintiff's] religious needs without undue hardship on the conduct of its business.").  Here, Artis-Naples is intimately familiar with the requested accommodations and has tried them out on a Philharmonic-wide scale for over a year.  (*See* Doc. 48 at 22; Doc. 1-4 at 3.)

Finally, Artis-Naples has presented evidence as to a number of business interests that would have been negatively impacted if exemption requests were granted.  For example, Ms. Van Bergen testified that the protocols committee was concerned that if Artis-Naples did not require all employees to be vaccinated, it would not be able to contract with touring Broadway performances, which required that "all performers on stage, backstage as well, [ ] be vaccinated."  (Doc. 48 at 102.) As Ms. Bergen stated, "[w]e knew that, if we wanted to be part of [ ] Broadway's return in the '21/'22 season, we would also have to comply with those vaccination policies."  (*Id.* at 102–103.)  While there were no Broadway productions, visiting orchestras, or visiting artists during the 2020–2021 season, Artis-Naples management was concerned that not enforcing a rigid vaccine mandate would harm "business relationships with other guest artists, Broadway series, [and] dance series" in the 2021–2022 season.  (*Id.* at 52–53, 103.)  Ms. Van Bergen further testified that "Artis-Naples is responsible for a large multidisciplinary mission from our Broadway presenters, from other agents in the industry, museum colleagues,"

and the protocols committee was in touch with all of these constituents and collaborators while drafting Artis-Naples's COVID-19 Policy.  (*Id.* at 90.)  Managing all of these different performers, many of whom are not Artis-Naples employees but instead are touring individually, required a uniform, established policy.  (*Id.* at 103).  Given that "so much of [Artis-Naples's] industry, especially the Broadway and headliner community, was committed to vaccination," it is unsurprising that Artis-Naples's COVID-19 Policy favored a vaccination requirement.  (*Id.* 116.)  Accordingly, Artis-Naples has presented evidence that accommodating Plaintiffs' religious beliefs, and failing to enforce a rigid vaccine requirement, would "cause undue hardship on the conduct of [its] business."  *Beadle*, 29 F.3d at 591–92; *Creger v. United Launch Alliance LLC*, 571 F. Supp. 3d 1256, 1264 (N.D. Ala. Nov. 30, 2021) (finding that defendant employer had established that granting its employees exemptions to a COVID-19 vaccine requirement was an undue hardship because employer's "contracts require staffing with vaccinated workers" and thus having unvaccinated workers would "burden the employer in conducting its business and result in a more than de minimis cost").

In sum, the evidence introduced thus far points to a number of the characteristic forms of undue hardships that courts have traditionally recognized as more than a de minimis cost.  First, Artis-Naples has shown that providing accommodations might deprive other musicians in the orchestra of their rights to be bound to a particular, chosen health policy established via their collective bargaining agreement.  *See Peterson*, 358 F.3d at 607–08 (undue hardship found

where contractual rights violated); *Virts*, 285 F.3d at 517–18 (undue hardship found where collective bargaining agreement violated); *Thomas*, 225 F.3d at 1153 (same). Artis-Naples has also presented credible evidence that providing accommodations might compel other employees to accept less favorable working conditions by forcing them to rehearse and perform for extended periods of time in close proximity to individuals who were at a higher risk of transmitting COVID-19. *See Brener*, 671 F.2d at 146–47 (undue hardship found where employees were "compelled to accept less favorable working conditions"); *GEO Grp., Inc.*, 616 F.3d at 273 (undue hardship found where religious accommodation "create[d] a genuine safety or security risk"). And Artis-Naples has shown that allowing exemptions to the Philharmonic vaccine policy may have unfairly imposed Plaintiffs' religious beliefs on other musicians who complied with the vaccine policy. *See Wilson*, 58 F.3d at 1341–42 (undue hardship found where employee's religious beliefs were imposed on coworkers and disrupted the workplace); EEOC, Compliance Manual on Religious Discrimination § 12-IV(B)(4) (undue hardship found where religious accommodation caused disruption at work). Finally, Artis-Naples has demonstrated that failing to strictly enforce its COVID-19 vaccine requirement may have negatively impacted the organization's ability to contract with visiting artists and touring Broadway shows during the 2021–2022 season. *See Creger*, 571 F. Supp. 3d at 1264 (undue hardship found where employer had federal government contracts that required staffing with vaccinated workers).

Artis-Naples has therefore submitted ample evidence that exempting on-

stage performers from the Philharmonic's vaccine requirement would have caused an undue hardship on its business operations.  And at present, Plaintiffs have not shown that they can overcome Artis-Naples's undue hardship defense by demonstrating that risks to employee safety and health, conflicts with the musicians' collective bargaining agreement, disruption in work routines, forcing musicians to potentially accept unfavorable working conditions, imposing some employees' religious beliefs on others, and disrupting Artis-Naples's ability to contract with other artists would not have occurred had accommodations been granted.  *See Creger*, 571 F. Supp. 3d at 1264.

This is not to say that Artis-Naples can or will eventually prove that accommodating Plaintiffs' requests would have actually caused an undue hardship. Rather, this holding is merely a finding that based on the evidence presented thus far, Plaintiffs have not shown that they can overcome Artis-Naples's undue hardship defense.  Thus, Plaintiffs have failed to prove a substantial likelihood of success on the merits.  *See Together Emps. v. Mass Gen. Brigham Inc.*, 573 F. Supp. 3d 412, 441 (D. Mass. Nov. 10, 2021) (explaining that where a defendant employer introduced evidence establishing that "permitting the named plaintiffs to continue to work . . . without being vaccinated would materially increase the risk of spreading the disease and undermine public trust and confidence in the safety of [defendant employers'] facilities," defendant employer had established that the plaintiffs did not have a substantial likelihood of success on the merits).

**B. Plaintiffs have not shown a substantial likelihood of success on the merits as to their retaliation claims under 42 U.S.C. § 2000e-3(a).**

In addition to their disparate treatment claims, Plaintiffs also allege retaliation under Title VII, 42 U.S.C. § 2000e-3(a) (Count IV). Based on the evidence presented thus far, however, Plaintiffs have not demonstrated a substantial likelihood of success on the merits on their retaliation claims.

Under Title VII, an employer may not retaliate against an employee because the employee has opposed an unlawful employment practice. *EEOC v. Total Sys. Serv., Inc.,* 221 F.3d 1171, 1174 (11th Cir. 2000) (citing 42 U.S.C. § 2000e-3(a)). Specifically, 42 U.S.C. § 2000e-3(a) provides that:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a). "To establish a prima facie case of retaliation under Title VII, a plaintiff must show that (1) he engaged in statutorily protected expression; (2) he suffered an adverse employment action; and (3) there is some causal relation between the two events." *Pennington v. City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001). If the plaintiff makes out a prima facie case, the burden shifts to the employer to articulate legitimate, non-discriminatory reasons for the adverse employment action. *Holifield v. Reno*, 115 F.3d 1555, 1564–66 (11th Cir. 1997). If the employer does so, the plaintiff bears the ultimate burden of showing by a preponderance of the evidence that the employer's legitimate, nondiscriminatory

reasons are a pretext for retaliation.  *Id.*

Here, Plaintiffs have not established a prima facie case of retaliation because they have not introduced evidence that they engaged in statutorily protected expression under Title VII.  Title VII recognizes two forms of statutorily protected expression.  An employee is protected from retaliation if "(1) 'he has opposed any practice made an unlawful employment practice by this subchapter' (the opposition clause) or (2) 'he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter' (the participation clause)."  *Clover v. Total Sys. Servs., Inc.*, 176 F.3d 1346, 1350 (11th Cir. 1999) (quoting 42 U.S.C. § 2000e-3(a)).  "Statutorily protected expression includes internal complaints of discrimination to superiors, as well as complaints lodged with the EEOC and discrimination-based lawsuits."  *Gerard v. Board of Regents of State of Ga.*, 324 F. App'x 818, 825 (11th Cir. 2009).  Plaintiffs allege that they engaged in statutorily protected expression when they:

> (1) requested a religious accommodation in August 2021 from the Mandate; (2) made their objections about the Mandate known to Artis-Naples in writing on numerous occasions; (3) informed [Ms.] van Bergen about the illegality of the Mandate under Fla. Stat. § 381.00317; and (4) requested exemptions to the Mandate pursuant to Fla. Stat. § 381.00317.

(Doc. 1 at ¶ 200.)

It does not appear that Plaintiffs have invoked retaliation under the participation clause here.  That is, Plaintiffs have not presented any appreciable argument that they were terminated in retaliation for filing charges of discrimination with the EEOC.  *See Clover*, 176 F.3d at 1353 (holding that "where

an employer conducts its investigation in response to a notice of charge of discrimination, and is thus aware that the evidence gathered in that inquiry will be considered by the EEOC as part of its investigation, the employee's participation is participation 'in any manner' in the EEOC investigation"); *Total Sys. Servs., Inc.*, 221 F.3d at 1174 n.3 (holding that because no EEOC charge had been filed before the allegedly retaliatory act, a plaintiff's internal sexual harassment complaint could not be protected under the participation clause).

Nor could they present such a retaliation argument because, by all indications, Plaintiffs only filed discrimination charges with the EEOC after they were terminated.  (*See* Doc. 6 at 11.)  To be sure, Plaintiffs state that, "[o]n June 30, 2022, Artis-Naples unlawfully terminated Plaintiffs' employment . . . Plaintiffs then filed discrimination charges with the Equal Employment Opportunity Office."  (*Id.*) Thus, based on the timeline presented by Plaintiffs, Artis-Naples could not have retaliated against them for their participation in the EEOC's charge process that commenced only *after* they were terminated.  Accordingly, even if Plaintiffs did specifically argue that the retaliation alleged occurred under 42 U.S.C. § 2000e-3(a)'s participation clause, that argument would fail.

Thus, any retaliation claim advanced by Plaintiffs based on the four types of expression listed above must be based on section 2000e-3(a)'s opposition clause.  But for the reasons below, the Court finds that none of these communications meet the criteria for the opposition clause and therefore fail to constitute "statutorily protected expression" for the purposes of a 42 U.S.C. § 2000e-3(a) retaliation claim.

30

i.      Requests for religious accommodation in August 2021

First, Plaintiffs point to their requests for religious accommodations to Artis-Naples's vaccine requirement as instances of statutorily protected expression.  (Doc. 1 at ¶ 200.)  Specifically, in August 2021, just after Artis-Naples announced its vaccine requirement, Plaintiffs filled out forms provided by Artis-Naples indicating that they would not receive a COVID-19 vaccine based on their religious beliefs. (Doc. 48 at 26, 86.)  Because Plaintiffs have not introduced any evidence that their exemption request forms expressed opposition to the vaccine requirement itself, they have failed to show that such forms constituted statutorily protected expression under 42 U.S.C. § 2000e-3(a).

Statutorily protected expression involves "complaining to superiors" about discriminatory working conditions.  *Johnson v. Booker T. Washington Broadcasting Serv., Inc.*, 234 F.3d 501, 507 (11th Cir. 2000).  "[T]he protection afforded by the statute is not limited to individuals who have filed formal complaints, but extends as well to those . . . who informally voice complaints to their superiors or who use their employer's internal grievance procedures."  *Rollins v. State of Fla. Dept. of Law Enforcement*, 868 F.2d 397, 400 (11th Cir. 1989).  In sum, statutorily protected expression includes some sort of protest or criticism, which precludes more anodyne communications such as requests for accommodation.

In a case factually similar to this one, the Eighth Circuit recently held that "merely requesting a religious accommodation is not the same as opposing the allegedly unlawful denial of a religious accommodation."  *EEOC v. N. Mem'l Health*

*Care*, 908 F.3d 1098, 1102 (8th Cir. 2018).  There, a Seventh Day Adventist brought Title VII retaliation claims against her employer after her employer denied her request for a religious accommodation that rendered the plaintiff unable to comply with the requirements of her union contract.  *Id.* at 1100.  The plaintiff claimed that she "ha[d] an opposition-clause retaliation claim under § 2000e-3(a) simply because her request for an accommodation was statutorily protected activity."  *Id.* at 1102.  The Eighth Circuit disagreed, holding that where "an employee or applicant requests a religious accommodation, and the request is denied by an employer . . . that accommodates reasonable requests that do not cause 'undue hardship,' there is no basis for an opposition-clause retaliation claim under § 2000e-3(a)."  *Id.* at 1103.  Indeed, "[c]onsistent with the plain meaning of the word 'oppose,' the initial request for a religious accommodation simply does not 'implicitly' constitute opposition to the ultimate denial of the requested accommodation."  *Id.* at 1102.

The same rationale applies here.  Under the plain meaning of "opposed" in section 2000e-3(a), the statute does not cover Plaintiffs' initial requests for religious accommodation—a blanket vaccine exemption—even though such requests for religious accommodations were ultimately denied by Artis-Naples.  42 U.S.C. § 2000e-3(a).  None of the evidence introduced by Plaintiffs indicates that their initial requests for accommodation "reflect[ed], much less communicate[d], opposition or resistance to any [Artis-Naples] employment practice."  N. Mem'l Health Care, 908 F.3d at 1103.  Accordingly, Plaintiffs' requests for exemptions to Artis-Naples's vaccine policy did not constitute statutorily protected "oppos[ition to] any practice

made an unlawful employment practice made an unlawful employment practice by this subchapter."  42 U.S.C. § 2000e-3(a).

### ii.   Informing Ms. Van Bergen about the illegality of the mandate under the newly enacted Fla. Stat. § 381.00317

Plaintiffs next argue that their efforts to inform Ms. Van Bergen "about the illegality of [Artis-Naples's] mandate under Fla. Stat. § 381.00317" meet the requirements of statutorily protected expression under Title VII.  To this end, Plaintiffs have introduced emails sent from Mr. Griffith and Ms. Leigh to Ms. Van Bergen notifying her of their beliefs that Artis-Naples is required to grant religiously grounded requests for exemptions to the vaccine requirement under Fla. Stat. § 381.00317.  (Doc. 1-19 at 3; Doc. 1-21 at 4.)

Fla. Stat. § 381.00317, which became effective on November 18, 2021, provides that "[a] private employer may not impose a COVID-19 vaccination mandate for any full-time, part-time, or contract employee without providing individual exemptions that allow an employee to opt out of such requirement on the basis of . . . religious reasons."  Fla. Stat. § 381.00317(1)(a).  Section 381.00317 does not provide a private right of action. Instead, it offers a terminated employee the opportunity to file a complaint with Florida's Department of Legal Affairs, which would thereafter investigate the complaint.  The statute further instructs that if the result of that investigation is a finding that the employee has been improperly terminated, the Attorney General must impose an administrative fine on the employer.  *Id.* § 381.00317(4)(a).

33

As noted above, Title VII protects speech made in "oppos[ition to] any practice made an unlawful employment practice by this subchapter." 42 U.S.C. § 2000e-3(a) (emphasis added). Thus, only where an employer's conduct is in violation of Title VII does speech complaining about such conduct constitute statutorily protected speech. Therefore, as a threshold matter, employer conduct in violation of Fla. Stat. § 381.00317 is not a per se violation of Title VII.

Unlike Title VII, which creates a private right of action prohibiting discriminatory conduct in the employment context, Fla. Stat. § 381.00317 prevents Florida employers from imposing vaccine mandates without providing exemptions and provides for enforcement by the Florida Attorney General. Fla. Stat. § 381.00317 does not once mention the terms discrimination, disparate impact, or disparate treatment. Thus, the protections and sanctions authorized by Fla. Stat. § 381.00317 are markedly different than the causes of actions and remedies authorized by Title VII. Given these differences, an employment practice made unlawful by Fla. Stat. § 381.00317 would not directly or indirectly implicate Title VII without some further showing of discriminatory conduct.

Here, there is no indication from the text of Plaintiffs' emails regarding Fla. Stat. § 381.00317 that Plaintiffs believed that Artis-Naples's employment practices in violation of this statute were also unlawful under Title VII.[6]

_____

[6] The Court notes that Ms. Leigh stated in a later email to Ms. Van Bergen, "I have clear statutory rights under Fla. Stat. 381.00317 (and Title VII), irrespective of when Artis' vaccination policy was implemented." (Doc. 1-21 at 2.) But this phrasing in no way suggests that Ms. Leigh believed that Artis-Naples's duties under the two statutes were coextensive, and as outlined above, based on the plain

Instead, Plaintiffs have introduced evidence indicating that they had good faith beliefs that Artis-Naples's employment practices were unlawful under Fla. Stat. § 381.00317.  (Doc. 1-19 at 3; Doc. 1-21 at 4.)  And Plaintiffs' counsel has explicitly conceded that "the statute does not appear to create a private cause of action," rendering its applicability to Title VII questionable.  (Doc. 48 at 143.) Accordingly, because Mr. Griffith's and Ms. Leigh's emails regarding Artis-Naples's responsibilities under Fla. Stat. § 381.00317 do not "oppose any practice made an unlawful employment practice Title VII," such emails are not statutorily protected expression under Title VII.  *See* 42 U.S.C. § 2000e-3(a); *see also Weeks v. Harden, Mfg. Corp.*, 291 F.3d 1307, 1311 (11th Cir. 2002) (holding that a complaint about an employer's practices is not a protected activity unless Plaintiffs show that they held a "good faith, reasonable belief that the employer was engaged in unlawful employment practices under [Title VII]").

### iii. Requests for exemptions to Artis-Naples's COVID Policy pursuant to Fla. Stat. § 381.00317.

Next, Plaintiffs argue that the forms they submitted to Artis-Naples seeking exemptions to Artis-Naples's vaccine policy pursuant to Fla. Stat. § 381.00317 constitute statutorily protected expression under Title VII.  These forms, which were emailed to Ms. Van Bergen by all three Plaintiffs, state that pursuant to Fla. Stat. § 381.00317, Mr. Griffith, Mr. Berg, and Ms. Leigh seek exemptions to Artis-Naples's vaccine requirement.  (Doc. 1-15 at 2–3; Doc. 1-16 at 2–3; Doc. 1-17 at 2–3.)

---

text of the two statutes, Artis-Naples's obligations under Fla. Stat. 381.00317 do not necessarily implicate Title VII.

For the same reasons outlined in the preceding subsections, these exemption requests also fail to meet the criteria for statutorily protected expression under Title VII.  First, as indicated above, requests for accommodations and exemptions do not constitute opposition to an employment practice made unlawful under Title VII.  Second, the exemption requests introduced by Plaintiffs here seek rights offered only under Fla. Stat. § 381.00317, not under Title VII, and therefore cannot be said to implicate Title VII as a matter of course.  *See Coutu v. Martin Cnty. Bd. of Cnty. Comm'rs*, 47 F.3d 1068, 1074 (11th Cir. 1995) (a plaintiff's complaint of "unfair treatment, absent discrimination based on race, sex, or national origin, is not an unlawful practice under Title VII" and is not protected speech for purposes of Title VII retaliation claims).  Given that Plaintiffs' exemption request forms made pursuant to Fla. Stat. § 381.00317 do not express opposition to any conduct that Plaintiffs believed violated Title VII, they cannot be deemed statutorily protected speech for the purposes of a Title VII retaliation claim.

### iv.    Repeated written objections to Artis-Naples regarding the vaccine requirement

Finally, Plaintiffs cite to their "numerous" written objections to Artis-Naples as an example of statutorily protected speech under Title VII.  But it is unclear what communications they are referring to beyond the forms and emails indicated above.  Without having introduced further examples of such written objections, Plaintiffs have not shown sufficient evidence that they expressed statutorily protected speech under Title VII.

As Plaintiffs have failed to establish the first element of a prima facie

retaliation claim under Title VII—engagement in statutorily protected expression—
the Court need not address the other two elements: adverse employment action and
causal effect. *See Shockley v. Macon Bibb Cnty., Georgia*, No. 5:15-cv-452 (MTT),
2017 WL 3599168, at *5 (M.D. Ga. Aug. 21, 2017*), aff'd in part, dismissed in part
sub nom. Shockley v. Barbee*, 747 F. App'x 754 (11th Cir. 2018).

> **v.   Even if Plaintiffs had set forth a prima facie case for
> retaliation under Title VII, they have still neglected to present
> evidence that Artis-Naples's legitimate, non-discriminatory
> reasons for their terminations were pretextual.**

As described above, if the plaintiff makes out a prima facie case, the burden
shifts to the employer to articulate legitimate, non-discriminatory reasons for the
adverse employment action, and if the employer does so, the burden shifts back to
the plaintiff to show that such reasons were pretextual. *Holifield*, 115 F.3d at
1564–66.

Here, even assuming, *arguendo*, that Plaintiffs established that they engaged
in statutorily protected expression, they suffered an adverse employment action,
and there was some causal effect between the two, they still have not established
that Artis-Naples's legitimate, non-discriminatory reasons for terminating them
were pretextual. *See Cuddeback v. Florida Bd. of Educ.*, 381 F.3d 1230, 1235–36
(11th Cir. 2004) (affirming district court's dismissal of plaintiff's retaliation claim
where the plaintiff established a prima facie case but failed to establish pretext).

Where pretext is an issue, the factfinder must discern whether the employer's
proffered reasons for termination were "a coverup for a . . . discriminatory decision."
*Rojas v. Florida*, 285 F.3d 1339, 1342 (11th Cir. 2002) (quoting *McDonnell Douglas*,

411 U.S. 805–806 (1973); *see also Damon v. Fleming Supermarkets of Fla., Inc.*, 196

F.3d 1354, 1361 (11th Cir. 1999) (observing that the Eleventh Circuit is "not in the

business of adjudging whether employment decisions are prudent or fair.  Instead

[its] sole concern is whether unlawful discriminatory animus motivates a challenged

employment decision").  Considering all of the evidence, therefore, the Court must

"ascertain whether [Plaintiffs] ha[ve] cast doubt on the defendant's proffered non-

discriminatory reasons sufficient to allow a reasonable factfinder to determine that

the defendant's proffered 'legitimate reasons were not what actually motivated its

conduct.'"  *Turner v. Inzer*, 521 F. Appx. 762, 764 (11th Cir. 2013) (quoting *Silvera v.*

*Orange Cnty. Sch. Bd.*, 244 F.3d 1253, 1258 (11th Cir. 2001).  In doing so, the Court

must evaluate whether Plaintiffs have demonstrated "such weaknesses,

implausibilities, inconsistencies, incoherencies, or contradictions in the employer's

proffered legitimate reasons for its action that a reasonable factfinder could find

them unworthy of credence."  *Combs v. Plantation Patterns, Meadowcraft, Inc.*, 106

F.3d 1519, 1538 (11th Cir. 1997).

Where an employer's proffered reason for termination is the violation of a

workplace rule—such as a vaccine requirement—such a reason is "arguably

pretextual" where Plaintiffs can show that: (1) "[they] did not violate the cited work

rule;" or (2) "if [they] did violate the rule, other employees outside the protected

class, who engaged in similar acts, were not similarly treated."  *Damon*, 196 F.3d at

1363.

As discussed in the preceding section regarding Plaintiffs' disparate

treatment claims, Artis-Naples has introduced ample evidence that it terminated Plaintiffs' employment for legitimate, non-discriminatory reasons. Specifically, Artis-Naples has stated that Plaintiffs' employment was terminated out of a significant concern that Plaintiffs' refusal to get vaccinated posed a risk to employee safety and health, conflicted with the musicians' collective bargaining agreement, disrupted in work routines, forced musicians to accept unfavorable working conditions, essentially imposed some employees' religious beliefs on others, and interfered with the organization's ability to contract with visiting artists and touring Broadway productions.

After careful review of the limited record before the Court, Plaintiffs have produced no evidence to rebut Artis-Naples's proffered reasons for their termination. The record evidence shows that two Artis-Naples employees— employees who are not onstage musician employees and who do not work in close proximity to other employees for extended periods of time—received vaccine exemptions from Artis-Naples. (Doc. 48 at 115–17.) Artis-Naples also did not provide vaccine exemptions for an assistant manager who worked in various customer facing roles, as well as a driver/valet who chauffeured visiting performers to and from performances, because both individuals' jobs required them, like Plaintiffs, to interact with guests and musicians for extended periods. (*Id.* at 116.)

In other words, the evidence presented shows that Artis-Naples evenhandedly required vaccination for all employees whose jobs entailed working for hours on end in close proximity to others. Plaintiffs have introduced no evidence

to show that Artis-Naples targeted only those individuals with sincerely held religious beliefs.  Thus, even if Plaintiffs were able to set forth a prima facie case for a Title VII retaliation claim, they have not carried their burden to rebut Artis-Naples's legitimate, non-discriminatory reason for terminating them.  *See Pennington*, 261 F.3d at 1267 ("'[A] plaintiff employee may not establish that an employer's proffered reason' is pretextual merely by questioning the wisdom of the employer's reason as long as 'the reason is one that might motivate a reasonable employer'") (quoting *Combs*, 106 F.3d at 1543); *Turner*, 521 F. Appx. at 765 (affirming summary judgment in favor of employer where the employer stated that he terminated the employee for insubordination and poor work performance, and the employee "produced no evidence to rebut the Clerk's proffered reasons for" the adverse employment actions that she suffered).

Accordingly, Plaintiffs have not shown a substantial likelihood of success on the merits with respect to their retaliation claims.

## II. Threat of Irreparable Injury

Next, the Court turns to whether Plaintiffs have demonstrated a substantial threat of irreparable injury.  *See Palmer*, 287 F.3d at 1329.  A showing of irreparable injury is "the sine qua non of injunctive relief."  *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am. v. City of Jacksonville, Fla.*, 896 F.2d 1283, 1285 (11th Cir. 1990) (citation omitted).  The Eleventh Circuit has cautioned that "even if [a plaintiff] establish[es] a likelihood of success on the merits, the absence of a substantial likelihood of irreparable injury would, standing alone, make

40

preliminary injunctive relief improper." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (citation omitted).

As the Supreme Court has stated:

The key word in this consideration is irreparable. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [an injunction], are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm.

*Sampson v. Murray*, 415 U.S. 61, 90 (1974) (citation omitted). An irreparable injury is one that "cannot be undone through monetary remedies." *Ne. Fla. Chapter of Ass'n of Gen. Contractors of Am.*, 896 F.2d at 1285. Further, speculative future injury, or a mere "possibility of irreparable harm," is not sufficient to invoke the "extraordinary remedy" of a preliminary injunction. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008) (citation omitted).

**A. The presumption of irreparable harm.**

Plaintiffs argue that based on Eleventh Circuit precedent, this Court may presume irreparable harm in Title VII cases, thereby justifying injunctive relief. (Doc. 6 at 26–27.) To support this argument, Plaintiffs rely on *Baker*, 856 F.2d at 169. In *Baker*, Aretha Baker filed a charge with the EEOC alleging that her employer discriminated against her because of her race. *Id.* at 168. After the EEOC issued a right to sue letter, Ms. Baker filed a civil rights action, and four months later, filed a motion for preliminary injunction "seeking to enjoin certain alleged retaliatory actions taken by [her employer] as a result of her filing suit." *Id.* The district court denied the motion finding that Ms. Baker had failed to establish

41

that she had been legitimately harmed or threatened with harm. *Id.* But on appeal, the Eleventh Circuit reversed this holding declaring, "[i]n this circuit . . . courts are to presume irreparable harm in Title VII cases." *Id.* at 169 (citing *U.S. v. Jefferson Cnty.*, 720 F.2d 1511, 1520 (11th Cir. 1983); *Middleton-Keirn v. Stone*, 655 F.2d 609, 611 (5th Cir. 1981)).

Later decisions have cast doubt on the degree to which *Baker* is a controlling authority. For example, a decade after *Baker* was decided, the Eleventh Circuit noted that *Baker* "evinces an intent to limit the holding to the facts of the case" because it stated that its finding regarding the presumption of irreparable harm was based "on the facts of this case." *McDonald's Corp.*, 147 F.3d at 1314. As the *McDonald's Corp.* court explained, the presumption of irreparable injury appears applicable only in those circumstances where "the plaintiff, who alleged violations of Title VII against her employer, sought a preliminary injunction against her employer barring the employer from engaging in certain actions the plaintiff viewed as retaliatory." *Id.* at 1313–14. If *Baker* is limited solely to the facts of that case, the Eleventh Circuit's holding in *Baker* is inapposite here as there are no ongoing retaliatory actions. Unlike in *Baker*, where the plaintiff moved to enjoin her employer from actively engaging in certain retaliatory conduct, here, the retaliatory actions alleged have already occurred; that is, Plaintiffs have already been terminated from their positions at Artis-Naples. Thus, to the extent the holding in *Baker* is only "[o]n the facts of th[at] case," the presumption of irreparable harm outlined by the court in *Baker* is inapplicable here. *See Baker*, 856 F.2d at 169;

42

*McDonald's Corp.*, 147 F.3d at 1313–14.

Helpful to understanding this distinction is a recent Fifth Circuit case, *Sambrano v. United Airlines, Inc.*, where employees of United Airlines challenged the company's vaccine mandate after they requested religious or medical accommodations from United.  No. 21-11159, 2022 WL 486610, at *2 (5th Cir. 2022). There, the Fifth Circuit made a notable distinction between the reparability of the two types of harms wrought by adverse employment actions.  *Id.* at *7.  The first— where an employer places employees who refuse to comply with the company's vaccine mandate on indefinite unpaid leave—was found by the Fifth Circuit to be reparable through backpay, reinstatement, or otherwise.  *Id.*  "The second form of harm flows from [an employer]'s decision to coerce the plaintiffs into violating their religious convictions; that harm and that harm alone is irreparable and supports a preliminary injunction."  *Id.*  The Fifth Circuit went on to note that United Airlines was "actively coercing employees to abandon their convictions" by requiring them to "violate their religious convictions or lose all pay and benefits indefinitely."  *Id.* at *9.  This was an "impossible choice" for United Airlines employees who "wanted to remain faithful but must put food on the table."  *Id.*  Thus, per the *Sambrano* majority, a plaintiff has satisfied the irreparable harm factor of the Title VII preliminary injunction analysis where he has alleged "*ongoing coercion* because of a protected characteristic."  *Id.* (emphasis in original).

The Fifth Circuit's non-precedential decision in *Sambrano* is also distinguishable from the facts presented by Plaintiffs.  Plaintiffs are not being

actively coerced by Artis-Naples to get a vaccine; they were fired on June 30, 2022 after they failed to get vaccinated.  (Doc. 6 at 11.)  And as the *Sambrano* court noted:

> If plaintiffs here merely alleged that a past action by the employer caused and will continue to cause economic harms, our precedent likely would not allow us to conclude that they have demonstrated irreparable harm.  But plaintiffs allege a harm of a different nature, and one that is ongoing. . . .  Plaintiffs are not merely seeking to prevent or undo the placement on unpaid leave itself, but are also challenging the ongoing coercion of being forced to choose either to contravene their religious convictions or to lose pay indefinitely.

*Sambrano*, 2022 WL 486610 at *9.  The care taken by the *Sambrano* court to distinguish between past harms and ongoing harms demonstrates the crucial nature of this distinction.  If the irreparable harm alleged is "the impossible choice" that comes from an employer demanding that its employees choose between their jobs and vaccination, that harm cannot be shown after Plaintiffs have been terminated for their decision not to receive the COVID-19 vaccine because at that point, the choice has been eliminated.  *See Together Emps. v. Mass Gen. Brigham Inc.*, 19 F.4th 1, 8 (1st Cir. 2021) ("Moreover, as the deadline for being vaccinated has passed, the appellants cannot point to an 'impossible choice' as a special factor here; they have already made their choices."); *Halczenko v. Ascension Health, Inc.*, 37 F.4th 1321, 1326 (7th Cir. 2022) (holding that where the plaintiff had already been fired, he had not suffered a similar harm to the harms alleged by the plaintiffs in *Sambrano*); *O'Hailpin v. Hawaiian Airlines, Inc.*, 583 F. Supp. 3d 1294, 1305 (D. Haw. Feb. 2, 2022), *appeal dismissed*, No. 22-15215, 2022 WL 3339844 (9th Cir. July 13, 2022) ("In this case, all of Hawaiian's employees were subject to the same

44

vaccination requirement as a condition of their employment.  A small percentage of employees, including Plaintiffs, elected not to receive the vaccination, and so have made a choice.").  Insofar as Plaintiffs here were fired for failing to comply with Artis-Naples's vaccine mandate, the irreparable harm of an impossible choice cannot be alleged because Plaintiffs have already made their choices.

### B. Plaintiffs have not presented sufficient evidence to demonstrate that termination from their competitive positions constitutes an irreparable harm.

Even if irreparable harm must be presumed, the presumption of irreparable harm may be overcome by a defendant via evidence presented at an evidentiary hearing.  *See Storves v. Island Water Ass'n, Inc.*, No. 2:10-cv-274-FtM-36SPC,  2010 WL 11622686, at *4 (M.D. Fla. Nov. 3, 2010) (the presumption of irreparable harm "may be rebutted by evidence that the injuries that may occur are not irreparable"); *see also Taylor v. Fla. State Fair Auth.*, No. 94-1376-CIV-T-17E, 1995 WL 688962, at *3 (M.D. Fla. Nov. 15, 1995) ("Since the presumption of irreparable harm is rebuttable, it must be analyzed in the traditional analysis for the entry of a preliminary injunction.").  Here, the presumption of irreparable harm has been rebutted by Artis-Naples.

Courts in the Eleventh Circuit have generally found that loss of employment is not considered an irreparable injury because it is fully compensable by monetary damages.  *See, e.g.*, *Creger*, 571 F. Supp. 3d at 1259 (holding that the potential harms associated with loss of employment "are either not irreparable—i.e., can be remedied through later compensation or other relief—or are based on speculation,"

in part because "each of the alleged injuries is contingent" on a "speculative"
inability to find new work). "[E]xternal factors common to most discharged
employees and not attributable to any unusual actions relating to the discharge
itself"—such as insufficiency of savings or difficulties in immediately obtaining
other employment—"will not support a finding of irreparable injury." *Sampson*, 415
U.S. at 92 n.68. In fact, wrongful discharge claims exist for that very reason,
allowing a wrongfully terminated plaintiff to receive monetary damages and
compensation for their loss of employment. *See Peeples v. Brown*, 444 U.S. 1303,
1305 (1979) (denying request for injunction preventing applicant's discharge and
holding that back pay "would be the usual, if not the exclusive, remedy for wrongful
discharge.").

Here, the irreparable injury alleged is the ostensible loss of a "once-in-a-
lifetime opportunity," namely a tenured position in a professional orchestra,
because Plaintiffs' "chances of obtaining a comparable, full-time position at another
orchestra are virtually zero." (Doc. 6 at 24.) Plaintiffs have presented significant
evidence that such positions are quite difficult to obtain. Ms. Leigh, for example,
testified that playing the clarinet professionally is "extremely, extremely
competitive" requiring "from a very early age, practic[ing] hundreds and now
thousands and thousands of hours actually, to be competitive, to even have a chance
to secure a professional job." (Doc. 48 at 62.) Mr. Berg similarly testified that there
were about two hundred musicians competing for one spot when he auditioned for
Artis-Naples. (*Id.* at 121.) Finally, Mr. Dallas testified that it can be difficult for

46

older musicians to get auditions because "the number of hours of preparation that it would take to win a national audition in an orchestra is usually accomplished by someone who's in grad school or coming out of grad school that can lock themselves in a practice room for hours and hours a day." (*Id.* at 47.)

Still, Plaintiffs have not presented adequate evidence to demonstrate that they could not secure employment at another orchestra.  First, Plaintiffs have stated that they are not inclined to apply for jobs at other orchestras because they enjoy living in Southwest Florida.  Mr. Berg, for example, testified that he was not able to apply to other professional orchestra jobs because he would have to sacrifice a lot to leave the Naples area.  (*Id.* at 121–22.)  Mr. Griffith echoed this sentiment, stating that he did not want to seek out other jobs around the United States because he had "established roots" in the Naples community and did not intend to leave.  (*Id.* at 135.)  Plaintiffs mentioned friends, children, parents, churches, and spouses' jobs as reasons they did not want to seek employment with other orchestras outside of Southwest Florida.  (*Id.* at 78, 121–22.)

While the Court takes these concerns seriously and sympathizes with the significant sacrifices that would be required of Plaintiffs and their families if they were to uproot their lives to join a new orchestra, such relocation is not uncommon in the world of competitive professions with relatively scarce employment opportunities.  A major league baseball player terminated from his team in Tampa Bay, for example, could not plausibly argue that his termination constituted an irreparable harm because trying out for teams in Cincinnati, San Diego, or Atlanta

would force him to uproot his family.  Such relocation is part and parcel of playing at the highest level of a profession where there is likely only one team in town and there is a national try-out/audition process to be put on the roster.

Furthermore, Plaintiffs have not introduced evidence demonstrating that securing a tenured position in a comparable orchestra is, as they contend, so unlikely that this Court would need to intervene prior to a final judgment.  For example, Mr. Dallas testified that he knew of at least two tenured musicians who left the Naples Philharmonic and found employment in other professional orchestras.  (*Id.* at 49–50.)  He also noted that he knew of at least a half-dozen individuals who worked for the Naples Philharmonic as part-time musicians and later "went off and won full-time jobs of their own."  (*Id.* at 50.)  And Ms. Leigh testified at the evidentiary hearing via Zoom from Nashville, where she was a semifinalist for a clarinet position in a Nashville-based professional orchestra.  (*Id.* at 76.)  While counsel for Ms. Leigh later notified the Court that Ms. Leigh advanced "from the semi-final round to the final round, where she competed . . . along with three other finalists, but did not win the position," being on the cusp of employment in a renowned orchestra, as Ms. Leigh was, speaks to the very real possibility that Ms. Leigh could indeed find employment as a professional musician elsewhere.  (Doc. 44 at 1.)

Additionally, Mr. Griffith testified that he had been offered about six weeks of work as a professional viola player at the Venice Symphony in Venice, Florida, and while this position was not tenured, it would offer him the possibility to play in

a professional orchestra just an hour's drive from his current home.  (Doc. 48 at 135.)  Finally, Mr. Berg introduced no evidence that he had even attempted to audition for a position in another orchestra.  In fact, he testified that he could not get another job in a professional orchestra because he was simply unable to dedicate sufficient time to practicing for auditions.  (*Id.* at 122.)

Last, the website to which Plaintiffs directed the Court, wherein orchestras around the world post employment opportunities, includes dozens of positions for each of the Plaintiffs instruments.  Since last month's evidentiary hearing, sixteen clarinet positions, forty-three violin positions, and twenty-seven viola positions have been posted.[7]  *See* MUSICAL CHAIRS, https://www.musicalchairs.info/clarinet/jobs (last visited Dec. 21, 2022); MUSICAL CHAIRS, https://www.musicalchairs.info/violin/jobs (last visited Dec. 21, 2022); MUSICAL CHAIRS, https://www.musicalchairs.info/viola/jobs (last visited Dec. 21, 2022).  While these positions may not be ideal for Plaintiffs for any number of personal or professional reasons, their existence indicates that the possibility of employment in a professional orchestra is not as remote as Plaintiffs contend.

In sum, Plaintiffs have shown either that they were unwilling to go through

---

[7] Though not all of these positions are "associate principal" or "assistant principal" or "first chair" or "second chair," and are thus titular demotions from Plaintiffs' current positions, Title VII caselaw is clear that Plaintiffs do not face irreparable harm merely because they cannot find the exact job that they want elsewhere.  *See Roth v. Lutheran Gen. Hosp.*, 57 F.3d 1446, 1460 (7th Cir. 1995) ("It is not 'irreparable injury' simply because [plaintiff] is unable to hand-pick the residency program he desires and refuses to make any reasonable effort to acquire a residency program.").

the audition process—in which case their claims that they could not get a job in another orchestra are purely speculative—or that they came extremely close to securing employment in another professional orchestra, indicating that their claims that they could not compete in obtaining a job in another orchestra are unfounded. Though the Court is sympathetic to Plaintiffs' alleged injuries, the irreparability of such injuries has simply not been established by the evidence offered thus far. *See Creger*, 571 F. Supp. 3d at 1268–69 (denying injunctive relief where potential harms stemming from employer's vaccine requirement were "either not irreparable – i.e., [could] not be remedied through later compensation or other relief – or [were] based on speculation"); *Together Emps.*, 573 F. Supp. 3d at 445 (holding that plaintiffs challenging their employer's vaccine requirement had failed to show a potential for irreparable harm where "damages are generally an appropriate remedy" and plaintiffs had "failed to show a genuinely extraordinary situation" because "loss of employment is not considered irreparable"); *Barrington v. United Airlines, Inc.*, 566 F. Supp. 3d 1102, 1113 (D. Colo. 2021) (denying injunctive relief where a plaintiff challenging her employer's vaccine requirement had not shown that the injuries she alleged were more than merely speculative and where, if plaintiff prevailed, she would be "entitled to reinstatement, back pay, back benefits, and reimbursement of other proven economic damages"); *O'Hailpin*, 583 F. Supp. 3d at 1303 (finding that plaintiffs had not established irreparable harm where they were terminated for failure to receive COVID-19 vaccines because plaintiffs failed to "demonstrate immediate threatened injury," and "[t]he possibility that adequate compensatory or

other corrective relief will be available at a later date" existed).

### C. Even termination from scarce, highly specialized jobs does not warrant a preliminary injunction.

Supreme Court precedent is clear that neither difficulty in obtaining other, comparable employment nor humiliation and damage to reputation inflicted by the plaintiff's discharge supports a showing of irreparable harm.  *See Sampson*, 415 U.S. at 92 n.68 ("[E]xternal factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself . . . will not support a finding of irreparable injury, however severely they may affect a particular individual.").

These principles remain true in the context of employees facing termination for failure to comply with the vaccine requirements of their employers.  In such circumstances, courts around the country have held that plaintiffs challenging their employers' COVID-19 vaccine requirements could not show that losing their employment because of non-compliance constituted irreparable harm.  *See Mass. Corr. Officers Federated Union v. Baker*, 567 F. Supp. 3d 315, 327 (D. Mass. Oct. 15, 2021) (finding that irreparable harm was lacking because "it is well settled that the loss of employment is not considered irreparable for the purposes of an injunction"); *Beckerich v. St. Elizabeth Med. Cntr.*, 563 F. Supp. 3d 633, 643 (E.D. Ky. 2021) (holding that loss of employment due to failure to comply with COVID-19 vaccine policy was "not considered to be an irreparable injury" because wrongful termination claims exist precisely to allow wrongfully terminated plaintiffs to recover "monetary damages to compensate their loss of employment"); *Bauer v.*

51

*Summey*, 568 F. Supp. 3d 573, 604–05 (D.S.C. Oct. 21, 2021) (finding that harm from loss of employment due to COVID-19 vaccination mandate was compensable by monetary damages and therefore not irreparable); *Valdez v. Grisham*, 559 F.Supp.3d 1161, 1181-82 (D.N.M. Sept. 13, 2021) (holding that being terminated or prevented from working as nurse based on COVID-19 vaccination mandate does not constitute irreparable harm); *Norris v. Stanley*, No. 1:21-cv-756, 2021 WL 3891615, at *3 (W.D. Mich. Aug. 31, 2021) (finding that plaintiff-employee failed to show irreparable injury would result if defendant-employer terminated her employment for failure to comply with COVID-19 vaccination mandate because any harm could be compensable by monetary damages); *Johnson v. Brown*, 567 F.Supp.3d 1230, 1258-62 (D. Or. Oct. 18, 2021) (finding no irreparable injury where plaintiffs faced losing their jobs and employment benefits due to Oregon executive order requiring healthcare and educational workers to be vaccinated against COVID-19).

Of course, here, the employment in question is not in abundant supply, and the Court is sympathetic to the unique nature of Plaintiffs' careers as professional musicians.  As Plaintiffs have made clear, positions in professional orchestras are difficult to obtain in large part because the positions include life tenure.  (*See* Doc. 6-2 at ¶¶ 4–10; Doc. 6-3 at ¶¶ 8–11; Doc. 6-4 at ¶¶ 7–12.)  But merely losing a job— even a highly desirable job—is rarely a ground upon which courts may issue an injunction.  *See Sampson*, 415 U.S. at 92 n.68; *see also Halczenko*, 37 F.4th at 1324– 25 (holding that a specialist doctor who was terminated from his job at a hospital

for failure to comply with his employer's vaccine mandate, and who argued that he would "rapidly lose his skills to the point that he w[ould] be unable to practice as a pediatric critical care specialist if not reinstated," was not entitled to preliminary injunctive relief because his alleged harm was purely speculative). And Plaintiffs have not directed the Court to any case law stating that a plaintiff is entitled to preliminary injunction ordering reinstatement where she cannot find the exact same employment under the exact same circumstances as her prior employment from which she was terminated. As the Supreme Court held in *Sampson*, "difficulties in immediately obtaining other employment—external factors common to most discharged employees and not attributable to any unusual actions relating to the discharge itself—will not support a finding of irreparable injury, however severely they may affect a particular individual." 415 U.S. at 92 n.68.

A comparable situation, which is instructive here, is that of a professor who alleges that he or she was discriminatorily terminated from his or her tenured or tenure-track job at a university and seeks a preliminary injunction for her immediate reinstatement. In such cases, courts have rarely found that the professor faced irreparable injury despite the unique qualities of a tenured or tenure-track faculty position. For example, where a professor argued that "his termination from his job was different from the average termination from a job" because "employment as a professor is scarce . . . involves a very large investment of human capital and cannot be replaced by monetary damages or other employment," the court found that despite the unique features of a career in academia, the

plaintiff had failed to demonstrate irreparable harm. *Blum v. Schlegel*, 830 F. Supp. 712, 726–29 (W.D.N.Y. July 1, 1993). And where a tenure-track professor alleged that his employment was terminated after the university employing him failed to abide by its own employment procedures, the court found that he was not entitled to a preliminary injunction reinstating him because he "ha[d] not shown any extraordinary factors that would make money damages an inadequate form of relief." *Holbrook v. U. of Va.*, 706 F. Supp. 2d 652, 655 (W.D. Va. April 5, 2010).

Accordingly, even in the context of highly specialized employment, guaranteed for a specific term, courts are reluctant to grant preliminary injunctions ordering reinstatement because such circumstances do not typically entail any sort of irreparable harm. Plaintiffs' allegations of irreparable harm based on the loss of their competitive and scarce positions are therefore similarly unavailing. Like the plaintiffs in *Blum* and *Holbrook*, Plaintiffs have failed to establish that the alleged harms they have suffered could not be more appropriately remedied at final judgment with potential reinstatement at that time; compensatory damages for future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life; punitive damages; and/or reasonable attorney's fees. *See* 42 U.S.C. § 2000e-5(g)(1); 42 U.S.C. § 1981a(b)(3); 42 U.S.C. § 2000e-5(k). The mere "possibility" of those sweeping remedies "weighs heavily against a claim of irreparable harm." *Sampson*, 415 U.S. at 90. The Court therefore finds that Plaintiffs have failed to establish a substantial likelihood of irreparable injury.

Because Plaintiffs have failed to establish a substantial likelihood of success

on the merits or a substantial threat of irreparable injury, the Court need not address the two remaining elements of the preliminary injunction analysis as Plaintiffs have already shown that they cannot carry their heavy burden warranting the issuance of a preliminary injunction. *See Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc.*, 299 F.3d 1242, 1247 (11th Cir. 2002) (failure to show likelihood of success on the merits obviates the need to "consider the remaining conditions prerequisite to injunctive relief"); *Ne. Fla. Chapter of the Ass'n of Gen Contractors v. City of Jacksonville*, 896 F.2d 1283, 1285 (11th Cir. 1990) ("We need not address each element because we conclude that no showing of irreparable injury was made").

## <u>CONCLUSION</u>

The Court will conclude where it began by noting that preliminary injunctive relief is an extraordinary form of relief that is inappropriate where a plaintiff's harm can "be undone through monetary remedies." *See Cunningham v. Adams*, 808 F.2d 815, 821 (11th Cir. 1987). To wit, a preliminary injunction is the "exception rather than the rule" and is "not to be granted unless the movant clearly establishes the burden of persuasion as to each of the four prerequisites." *Four Seasons Hotels And Resorts, B.V. v. Consorcio Barr, S.A.*, 320 F.3d 1205, 1210 (11th Cir. 2003). It is axiomatic that "[m]andatory preliminary relief, which goes well beyond simply maintaining status quo[,] is particularly disfavored, and should not be issued unless the facts and law clearly favor the moving party." *Martinez v. Matthews*, 544 F.2d 1233, 1243 (5th Cir. 1976).

Here, it is not the Court's place to question the sound judgment of Artis-Naples's COVID-19 Policy, which resulted in the termination or resignation of "20 or 24" individuals, (Doc. 48 at 115), as "federal courts do not sit to second-guess the business judgement of employers," *Combs*, 106 F.3d at 1543. Instead, the Court's sole task is to determine, based on the facts before it, whether Plaintiffs have made a clear showing that an injunction before trial is warranted. *Siegel*, 234 F.3d at 1176. After reviewing the pleadings, testimony, and declarations presented thus far, the Court finds that Plaintiffs have failed to make such a showing.

First, Plaintiffs have failed to establish a substantial likelihood of success on the merits of any of their claims. While Plaintiffs have presented a prima facie case of disparate treatment under Title VII, they have failed to present evidence to overcome Artis-Naples's undue hardship defense. Specifically, Plaintiffs have not shown that risks to employee safety and health, conflicts with the musicians' collective bargaining agreement, disruption in work routines, forcing musicians to accept unfavorable working conditions, effectively imposing some employees' religious beliefs on others, and interfering with Artis-Naples's ability to contract with visiting artists and touring Broadway shows would not have occurred had accommodations been granted to the Plaintiffs. Plaintiffs have also failed to present evidence to prove a substantial likelihood of success on the merits as to their retaliation claims. And even if Plaintiffs could establish a substantial likelihood of success on the merits of the Title VII claims alleged (or any claim), the Court holds that Plaintiffs have failed to show that irreparable injury would result

56

if no injunction were issued.

      While the strength of each party's case may change after discovery is completed, based on the evidence presented to the Court at this very early stage of litigation, the Court finds on the two separate and independent grounds outlined above that Plaintiffs' Motion for Preliminary Injunction is due to be denied.

      Accordingly, it is hereby **ORDERED** that Plaintiffs' Motion for Preliminary Injunction and Supporting Memorandum of Law (Doc. 6) is **DENIED**.

      **ORDERED** at Fort Myers, Florida on December 30, 2022.

**JOHN L. BADALAMENTI**
UNITED STATES DISTRICT JUDGE